UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT WINCHESTER

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | Case No. 4:12-cr-19 |
| v. | ) | *Mattice / Lee* |
| | ) | |
| VICTOR J. STITT, II, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION**

**I.   Introduction**

Defendant Victor J. Stitt, II ("Defendant") filed a motion to suppress all evidence seized by law enforcement claiming they encroached upon the curtilage of his home without a warrant [Doc. 66].[1] For the reasons stated herein, I **RECOMMEND** that Defendant's motion be **DENIED**.

**II.   Evidence and Background**

Defendant is charged in a one-count Indictment with being a felon in possession of a firearm on October 21, 2011 [Doc. 1]. At the suppression hearing, the government offered the testimony of Lee Nettles ("Nettles"), a former officer with the Coffee County Sheriff's Department and, in rebuttal, the testimony of Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") Special Agent Stephen Gordy ("Gordy"). Defendant offered the testimony of his mother, Donna Vaughan ("Vaughan").

**A.   Nettles' Testimony**

Nettles testified as follows. He has been in law enforcement since the early 1990s and

---

[1] The motion was referred for a report and recommendation pursuant to 28 U.S.C. §§ 636(b)(1)(B) and (C) [Doc. 68]. The government filed a response in opposition to the motion [Doc. 72]. An evidentiary hearing on the motion was held on June 26, 2013, and Defendant submitted post-hearing cases for consideration [Doc. 74]. The matter is now ripe for decision.

recently went into the private investigation business. While employed as an officer of the law, Nettles investigated thousands of crimes, including hundreds of cases of assault; he is also experienced with tracking fugitives.

On October 21, 2011, Nettles, who was with two other officers, received several dispatches that cumulatively reported Defendant, a white male, had assaulted his girlfriend with a gun at the Riddle Road trailer park in Coffee County and then fled the scene in a tan Kia with a Tennessee tag and that Defendant's mother lived at 6790 Hollow Springs Road in Cannon County. Nettles[2] and the other officers were only about five miles from Hollow Springs Road, so they went to the mother's address in an effort to engage in a "knock and talk"[3] with the mother in an attempt to locate Defendant to investigate the reported armed assault.

Upon arrival at the address, Nettles saw a driveway about 100 yards long at the right of a stationary, single-wide trailer. Nettles drove to the end of the driveway and stopped at what he perceived was the parking area located on the right side of the trailer at the rear end of the driveway. Nettles saw no obstruction or any other indication that the driveway ended before Nettles stopped and parked his vehicle. Nettles did not see a parking area near the front door of the trailer. There was a wire fence around the front yard, but the fence did not obstruct his view of the trailer or block his entry to the driveway; instead, it separated the driveway from the yard. There was no closed gate

---

[2] Detective Nettles was transitioning from a position on the 14th Judicial District Drug Task Force to the Coffee County Sheriff's Office. At the relevant time, he was commissioned as a state investigator with state-wide jurisdiction. At the hearing, Defendant stated he is not contesting Nettles' investigative jurisdiction to be at the residence at issue.

[3] A knock and talk is a non-custodial procedure in which a police officer identifies himself and asks to talk to a home occupant and typically eventually requests permission to search the home. "Courts generally have upheld this investigative procedure as a legitimate effort to obtain a suspect's consent to search." *U.S. v. Chambers*, 395 F.3d 563, 567 n.2 (6th Cir. 2005).

2

or other barrier at the entrance of the driveway. The driveway was a grass and gravel path leading to the side of the trailer. There were no bushes, shrubbery, or other means of protecting the driveway from observation from the road.

Before Nettles could even get out of his car, he saw a tan Kia parked behind the trailer in the backyard and a white male, later identified as Defendant, sitting on the back deck. When Defendant made eye contact with Nettles, Defendant fled. Nettles exited his vehicle, stepping onto the gravel of the driveway, shouting that he was with the Sheriff's Department and giving chase after the fleeing suspect. Nettles saw Defendant round the far corner of the trailer and as Nettles rounded the corner, he saw Defendant get up off the ground where he had apparently fallen in his haste to get away. Defendant was arrested and handcuffed. A firearm, cell phone, and hair cutting equipment were found on the ground where Defendant had fallen.

### B.     Vaughan's Testimony

Vaughan testified as follows. She is Defendant's mother and presently she is the sole resident at 6790 Hollow Springs Road, where she has lived for the past 13 years. Throughout 2011, Defendant stayed at her residence "off and on." Although he did not have his own key to the trailer, Defendant had access to a key to the backdoor of the trailer. The key was hidden in a location known to Defendant (and a few others) in a shed located in the backyard.

The trailer, which is less than 20 feet wide, is set back from the road approximately 100 yards, such that a passerby cannot see into the portion of the backyard located directly behind the trailer. The trailer has a connected back porch and a backyard fire pit, which are used for family gatherings, Bible Study, cookouts, star-gazing, and sunbathing. By positioning the trailer some 100 yards from the road, Vaughan sought privacy from the public for her backyard activities.

The property is situated among cornfields and wooded areas and is surrounded by a two-wire electric fence. The fence has a gate which serves to fully enclose the property, although this gate was not closed when law enforcement arrived on October 21. From Vaughan's testimony, it appears the front gate is infrequently closed; that is, only on those occasions when Vaughan had horses that she wanted to graze on her yard. The gate is located near the start of the gravel driveway at Hollow Springs Road. Neither the fence nor the gate serves as a visual obstruction or barrier to an observer on the road and there is no "privacy fence" to obstruct visual observation of the property.

Along the right side of the property is the gravel and grass driveway, which both extends along the side of the trailer and curves around in front of the trailer. Stairs lead to the front door, and it is clear that this door is the main entrance to the residence. The driveway also continues along the right side of the trailer, but does not go past the end of the trailer. This side section of the driveway is used as a back-up and turn-around area. It is not used for private activities such as sunbathing. Vaughan contends there is a clear terminus of gravel where the driveway ends approximately one to two feet in front of the rear end of the trailer, and that there is a drop-off at the end of the driveway indicating as much. She also testified that from a vehicle properly parked in this side driveway area, it is not possible to see the back porch or backyard.

Vaughan regularly parks her van in front of the trailer, as it is easy to unload things and enter the residence from the front driveway area. Guests typically park in front of the trailer behind Vaughan and utilize the side driveway area for parking only when there are more than two cars in the front driveway area. In general, persons are not permitted to park beyond the gravel driveway in the backyard; however, Vaughan permits a family friend, John Whittaker ("Pop"), to occasionally park in the backyard when he is unloading firewood or doing repairs in the backyard shed.

4

On June 25, 2013, Gordy asked her if he could take pictures of her property. Regarding the pictures of Gordy's parked car introduced into evidence, Vaughan testified that he had parked beyond the terminus of the gravel driveway, which was an impermissible place to park as it was not on the driveway.

### C. Gordy's Testimony

Gordy has been a Special Agent with the ATF for approximately 12 years. Gordy was not at Vaughan's residence when Defendant was arrested on October 21, 2011, but he later visited the property on June 25, 2013.

When Gordy arrived, he parked in what seemed to him to be an appropriate place: the end of the driveway on the right side of the trailer. The windshield of his van was aligned with the back wall of the residence, such that the nose of the van was approximately three to four feet past it. When Gordy got out of his vehicle, he stepped out onto gravel in the driveway. He stated there is no discernible drop-off at the end of the driveway. His car was in approximately the same place where Nettles was parked in 2011. From where he was parked, Gordy could not see the far back corner end of the trailer, but he could see the porch, backyard, fire pit, and shed.

Unsure whether Vaughan was home, Gordy first went to the front door and knocked. Vaughan answered and gave Gordy permission to take pictures. At no point during this visit did Vaughan ask Gordy to move his car or indicate he was improperly parked. There was no barrier, drop-off, or other indication that he was not allowed to park where he did.

### D. Photographs

Photographs of the property, including the trailer, backyard, and driveway, were entered into evidence during each witnesses' testimony. Some of the photographs were taken on the date at issue,

5

October 21, 2011; some were taken the day before the suppression hearing, June 25, 2013; and one, a Google satellite map photograph, was taken at an unknown time period. The parties appeared to be in agreement that the photographs were all generally accurate depictions of the property on October 21, 2011, although the angles from which the various photographs were taken may have resulted in some distortions.

In a picture taken October 21, 2011, Pop's vehicle is parked in the backyard in front of the Kia and there are visible tire tracks leading from the end of the driveway to the backyard where Pop's vehicle and the Kia were parked when the officers arrived.

### III. Analysis

In summary, Defendant alleges the police violated the Fourth Amendment when they drove down the driveway, past the front entrance and parking area, somewhat past the side of the trailer and back-up area, and allegedly parked beyond the end of the driveway, which gave them a view into the private backyard of the residence without a warrant. The government responds there was no violation of the Fourth Amendment because they stayed on the publicly accessible driveway until they spotted Defendant fleeing.

#### A. Fourth Amendment

The Fourth Amendment provides "[t]he right of the people to be secure in their . . . houses

6

Case 4:12-cr-00019-HSM-SKL   Document 75   Filed 07/15/13   Page 6 of 12   PageID #: 249

. . . against unreasonable searches and seizures, shall not be violated . . . ." U.S. Const. amend. IV.[4] The Supreme Court has long recognized that "a man's home is his castle" and, specifically, that a right to be secure in one's home from intrusion is embodied by the Fourth Amendment. *Minnesota v. Carter,* 525 U.S. 83, 94 (1998) (Scalia, J., concurring) (emphasis omitted); *see also Florida v. Royer,* 460 U.S. 491, 497 (1983); *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). A warrantless search of, or seizure from, a residence is "per se unreasonable under the Fourth Amendment   subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967); *accord United States v. Nelson*, 459 F.2d 884, 885 (6th Cir. 1972) (noting that the Fourth Amendment exists to ensure the inviolability of an individual's home). The burden is on the government to demonstrate by a preponderance of the evidence the circumstances that "overcome the presumption of unreasonableness that attaches to all warrantless home entries." *United States v. Washington*, 573 F.3d 279, 286 (6th Cir. 2009) (citation and internal quotations omitted).

For Fourth Amendment protection purposes, a person's home includes its "curtilage." *See United States v. Jenkins*, 124 F.3d 768, 772 (6th Cir. 1997). The curtilage of a dwelling is "the area to which extends the intimate activity associated with the sanctity of a man's home and the privacies of life." *Dow Chem. Co. v. United States*, 476 U.S. 227, 236 (1986) (internal quotation marks and

---

[4] "[A] defendant claiming that a search violated his Fourth Amendment rights has the burden of demonstrating that he had a legitimate expectation of privacy in the place that was searched." *United States v. Talley*, 275 F.3d 560, 563 (6th Cir. 2001) (citing *United States v. Sangineto-Miranda,* 859 F.2d 1501, 1510 (6th Cir. 1988)). Here, there was little-to-no proof that Defendant had a legitimate expectation of privacy in the residence. While his mother made a passing comment that Defendant stayed at the trailer off and on, she also mentioned Defendant did not have a key; instead, the mother's key to the backyard was kept in the shed for use by persons including Defendant. The government apparently concedes Defendant's legitimate expectation of privacy at his mother's residence, however, as it did not challenge Defendant's "standing" in any way.

7

citations omitted). The parties agree the factors to consider when evaluating whether an area adjacent to a home constitutes curtilage include: (1) "the proximity of the area claimed to be curtilage to the home;" (2) "whether the area is included within an enclosure surrounding the home;" (3) "the nature of the uses to which the area is put;" and (4) "the steps taken by the resident to protect the area from observation by people passing by." *United States v. Galaviz*, 645 F.3d 347, 355 (6th Cir. 2011) (quoting *United States v. Dunn*, 480 U.S. 294, 301 (1987)); *see also United States v. Estes*, 343 F. App'x 97, 100 (6th Cir. 2009). "[T]hese factors are useful analytical tools only to the degree that, in any given case, they bear upon the centrally relevant consideration whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." *Dunn*, 480 U.S. at 301.

  B.  **Were the Police Properly Present When Defendant Was Spotted?**

Defendant's Fourth Amendment argument is predicated on his claim that the officers were not lawfully at the spot where Nettles parked his car without a warrant. Defendant argues the officers drove several feet past the end of the parking area of the driveway, which placed them on, and gave them an improper view into, non-public areas within the curtilage of the residence in violation of Defendant's Fourth Amendment rights. It was from the vantage of the parking spot that the officers observed the Kia and the fleeing suspect.[5] I **FIND** Defendant's arguments fail.

The Sixth Circuit Court of Appeals has described a residential driveway as both an open field, not subject to Fourth Amendment protection, *see, e.g., Johnson v. Weaver*, 248 F. App'x 694, 696 (6th Cir. 2007) (holding that "[b]ecause the driveway constitutes an 'open field,' [plaintiff] holds

---

[5] Defendant does not challenge the officers' actions subsequent to seeing the Kia and a white male fleeing the porch. The only issue presented is whether the police violated the Fourth Amendment by their very presence at the area where they observed Defendant's flight and Kia.

8

no reasonable privacy expectation in it, and his efforts to shield that area from any manner of unwelcome guest prove inconsequential[]"), and as curtilage subject to Fourth Amendment protection under certain circumstances, *see, e.g., United States v. Smith*, 783 F.2d 648, 651 (6th Cir. 1986) (curtilage not defined by physical location; whether driveway is protected from entry by police depends on circumstances; whether driveway is within curtilage is not determinative if its accessibility and visibility from a public highway rule out any reasonable expectation of privacy); *United States v. Galaviz*, 645 F.3d 347, 355-56 (6th Cir. 2011) (police officers did not need a warrant to enter the driveway because the driveway was directly adjacent to the house, was short, was not enclosed by a fence or other barrier, no apparent steps were taken by residents of the house to protect the driveway from observation by passers by, and the portion of the driveway where the car was parked directly abutted the public sidewalk). Regardless of its label as curtilage, whether a driveway area is protected from a warrantless entry by law enforcement officers depends on the circumstances.

In this case, the driveway area where Nettles parked was close to the home; was within a grazing fence surrounding the land, but the gate to the driveway area was open and the fence seemed more designed for keeping any horses away from the yard than for keeping visitors away from the trailer; was used to turn around and park cars, including cars driven by members of the public; and was not protected from observation by people passing by. I **FIND** the area where Nettles parked was impliedly open to use by the public and was not used for intimate activity associated with the sanctity of a man's home and the privacies of life.

It is widely accepted that police entry to an area accessible to visitors in the course of conducting legitimate law enforcement activities does not violate the Fourth Amendment. *See, e.g., Smith*, 783 F.2d at 651; *United States v. Evans*, 27 F.3d 1219, 1228 (7th Cir. 1994) (holding that

9

"[t]he agents' approach to the garage did not implicate a Fourth Amendment interest because [defendant] did not present any evidence at the suppression hearing that he had a reasonable expectation of privacy in the driveway."); *United States v. Reed*, 733 F.2d 492, 501 (8th Cir. 1984) (holding that "no Fourth Amendment search occurs when police officers who enter private property restrict their movements to those areas generally made accessible to visitors such as driveways, walkways, or similar passageways."); *United States v. Reyes*, 283 F.3d 446, 465 (2d Cir. 2002) (holding that "[t]he route which any visitor to a residence would use is not private in the Fourth Amendment sense.") (quoting 1 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 2.3(e), at 499 (3d ed. 1996) (footnotes omitted)); *Edens v. Kennedy*, 112 F. App'x 870, 875 (4th Cir. 2004) ("In the absence of a fence with a locked gate, a homeowner is likely to receive visits from pollsters, door-to-door salespeople, and trick-or-treaters, among others. There is no constitutional basis for excluding police officers from this list of potential visitors."); *United States v. Wells*, 648 F.3d 671, 679 (8th Cir. 2011) ("[H]omeowners grant members of the visiting public mail carriers, sanitation workers, neighbors, and Girl Scouts, to name a few an implied consent to enter [driveways, walkways, or similar passageways] for those purposes that accompany the normal interactions of a social, civilized society.").[6] As a result, I **FIND** the police were properly parked in an area generally accessible to visitors.

Visual inspection of a private area within the curtilage of a home from a lawful vantage point does not violate the Fourth Amendment. *See California v. Ciraolo*, 476 U.S. 207, 215 (1986) ("The

---

[6] Proceeding on the back driveway does not implicate the Fourth Amendment even if the officers trespassed by doing so. *See Knott v. Sullivan*, 418 F.3d 561, 573-74 (6th Cir. 2005) (holding that defendant officers' warrantless entry onto homeowner's driveway did not violate homeowner's Fourth Amendment rights in Section 1983 lawsuit in spite of trespass).

10

Fourth Amendment simply does not require the police traveling in the public airways . . . to obtain a warrant in order to observe what is visible to the naked eye."); *Dunn*, 480 U.S. at 304 ("standing … in the open fields, the Constitution did not forbid [the officers] to observe" the curtilage). So long as the observations are "from a public vantage point where [a police officer] has a right to be and which renders the activities clearly visible," there is no Constitutional violation, regardless of a homeowner's attempts to restrict some views of his activities. *Ciraolo*, 477 U.S. at 213. Given that Nettles was properly and lawfully parked, and that he was able to see the Kia and Defendant without obstruction even before he exited his vehicle, I **FIND** no Fourth Amendment violation based on Nettles' view into the backyard area.

Defendant's claim that the police actually drove a short distance past the end of the driveway does not result in a Fourth Amendment violation. I **FIND** there was no clear end to the driveway and Nettles credibly testified that he stepped out onto the gravel driveway when he exited his car, which he parked in the driveway. Based on the photographs and the testimony, I **CONCLUDE** Nettles properly parked his car at the far end of the driveway, but he remained in an area generally made accessible to visitors.[7] Vaughan's testimony in this regard was less credible than Nettles. Defendant's argument regarding the warrantless entry to the area where Nettles parked on the driveway fails because, even if it is considered curtilage, that area is visible and accessible to the

---

[7] Moreover, even if Defendant were to prevail on his claim that Nettles (and Gordy) pulled up farther than the driveway extended, there is no evidence Nettles had any intention to do so. In other words, there is no evidence any such conduct was deliberate, reckless, or grossly negligent. Thus, any benefits of deterrence would not outweigh the costs to society of suppression. *See United States v. Master*, 614 F.3d 236, 243 (6th Cir. 2010) (quoting *Herring* v. *United States*, 555 U.S. 135, 144 (2009) and reasoning that "the *Herring* Court's emphasis seems weighed more toward preserving evidence for use in obtaining convictions, even if illegally seized, than toward excluding evidence in order to deter police misconduct unless the officers engage in 'deliberate, reckless, or grossly negligent conduct.'").

11

general public. As such, there is no reasonable and legitimate expectation of privacy in that area, even if it allows one to see into the backyard, which is not visible from the road. The officers were lawfully allowed to approach the residence for investigative purposes via the driveway and what they saw from that vantage point is not subject to suppression.

## IV. Conclusion

For the reasons stated herein, I **RECOMMEND** that Defendant's motion [Doc. 66] be **DENIED**.

s/ *Susan K. Lee*
SUSAN K. LEE
UNITED STATES MAGISTRATE JUDGE